J-S77003-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.B., | : | IN THE SUPERIOR COURT OF |
| C.S.C.B., G.B., L.B., F.B., L.B. | : | PENNSYLVANIA |
| AND A.B., MINORS | : | |
| | : | |
| | : | |
| APPEAL OF: R.B., MOTHER | : | |
| | : | |
| | : | |
| | : | No. 791 MDA 2016 |

Appeal from the Dispositional Order entered on April 18, 2016
In the Court of Common Pleas of Lancaster County
Juvenile Division at No(s):  CP-36-DP-0000030-2016
CP-36-DP-0000031-2016
CP-36-DP-0000032-2016
CP-36-DP-0000033-2016
CP-36-DP-0000034-2016
CP-36-DP-0000035-2016
CP-36-DP-0000036-2016

BEFORE:  PANELLA, J., OLSON, J., and PLATT*, J.

MEMORANDUM BY PANELLA, J.                    **FILED JANUARY 20, 2017**

Appellant, R.B. ("Mother"), appeals from the orders[1] of the trial court

entered on April 18, 2016, adjudicating her seven children M.B. (born in

March 2004); C.S.C.B. (born in June 2004)[2]; G.B. (born G.J., in May 1998);

_____

* Retired Senior Judge assigned to the Superior Court.

[1] The appeals statement of the caption references the singular, "Dispositional Order." Due to internal Court software issues, the statement cannot state "Orders."

[2] Mother and her husband, B.B. ("Father") adopted C.S.C.B. while they were residing as a married couple in Taiwan. **See** N.T., 4/14/16, at 102. G.B. is
*(Footnote Continued Next Page)*

L.B.1 (born in May 2007); F.B. (born in August 2005); L.B.2 (born in November 2008); and A.B. (born March 2011) (collectively, the "Children") dependent pursuant to 42 Pa.C.S.A. § 6302, and ordering that legal and physical custody of the Children remain with the Lancaster County Children and Youth Social Services Agency ("CYS" or the "Agency"), and the Children remain in their placements in kinship care.[3] We affirm.

The trial court summarized the relevant factual and procedural history of this matter as follows.

> Mother and Father are the parents of the seven children at issue. They separated prior to the involvement of the Agency with the family. Mother has been the primary caretaker for the children during the past few years. During this time, the Agency received multiple reports expressing concern for the children's well-being. On June 26, 2015, the Agency received a report that Mother was making paranoid statements about her skin being filled with shards of glass. Though a doctor found nothing physically wrong with her, it was noted that she had several puncture marks on her skin from picking out imaginary shards. Mother refused to accept services from the Agency.

*(Footnote Continued)* ──────────────

Mother's son from a marriage prior to her marriage to Father. *See id*., at 102. Mother and Father were legally married at the time of the April 14, 2016 hearing in this matter, but were awaiting a divorce decree. *See id*., at 94. At the close of the April 14 hearing, the trial court ordered the references in the petition and family service plan for G.J. be amended to change his name to G.B., reflecting Father as his father. *See id*., at 115. The supplemental certified record in this matter contains an order, entered on June 17, 2016, for termination of court supervision for G.B., as he has reached the age of eighteen.

[3] Father did not challenge the order by filing a separate appeal. Father filed a brief in the instant appeal on August 25, 2016.

On August 15, 2015, it was reported that Mother had gotten upset, grabbed a handful of her daughter [L.B.2's] hair, and cut it off. It was also reported that Mother was periodically withholding food as a way to discipline the children. When the Agency investigated, Mother stated that some things in the report had been taken out of context, that she had been prescribed medication, was having a hard day, and that the child cut her own hair. On November 5, 2015, the Agency received a report that the home where Mother was staying with the children was unkempt, and that the children had complained about a lack of food. At that time[,] the Agency did not investigate beyond a home visit because the home appeared appropriate and there was food in the cabinets.

On January 13, 2016, the Agency received the report which directly led to the placement of the children. It was reported that Mother and the children had been living in various hotels since December 8, 2015. [G.B.], the oldest child, was placed with his maternal grandparents, and the six younger children were placed with their paternal grandparents.

Trial Court Opinion, 6/14/16, at 2-3.

The trial court explained the procedural background of this appeal as follows.

This matter came before the [c]ourt on January 28, 2016, when the Lancaster County Children and Youth Social Service Agency (Agency) presented a Petition for Temporary Custody of [M.B.], [S.C.C.B.], [G.B.], [L.B.1], [F.B.], [L.B.2], and [A.B.]. A shelter care hearing was held on January 29, 2016, before a Master. [R.B.] (Mother) and [B.B.] (Father) waived the hearing without admitting any of the allegations in the Agency's Petition for Dependency. The Master recommended that the Agency be given temporary legal and physical custody of the children. This recommendation was adopted by Order of the [c]ourt on January 29, 2016.

An Adjudication and Disposition Hearing scheduled for February 25, 2016, was continued to March 3, 2016, due to the unavailability of the assigned judge. On March 3, 2016, the Adjudication and Disposition Hearing was continued at the request of the Mother to give her additional time to retain an

- 3 -

attorney. On that date, Mother was advised of the date of the next hearing and the availability of court[-]appointed counsel if she was unable to afford private counsel.

*Id*., at 1-2.

The trial court held the adjudication and disposition hearing on April 14, 2016. Mother appeared without counsel, and, again, sought a continuance, stating that she had retained counsel on the evening prior to the hearing. The trial court refused to continue the hearing without proof that she had retained counsel, Mother provided none, and the hearing proceeded. *See* N.T., 4/14/16, at 4-10.

At the hearing, CYS first presented the testimony of Lorraine Gutierrez, the CYS "normal family support" caseworker assigned to the family. *Id*., at 11. As the questioning of Ms. Gutierrez by counsel for CYS, Attorney David Natan, neared completion, Father's counsel requested, and obtained, leave of court for his paralegal to use the restroom, as the paralegal felt ill. *See id*., at 59. Mother also requested leave to use the bathroom, stating that she was "having a similar problem." *Id*. When the court asked Mother if she could await the completion of direct examination of Ms. Gutierrez in approximately three minutes, Mother indicated that she could wait. *See id*. At the close of the direct examination, the trial court took a brief recess. *See id*., at 63. Mother departed the courtroom and took all of her belongings from her table. *See id*.

Both Father's counsel, Attorney Patrick Diebler, and the guardian *ad litem*, Cynthia Garman, cross-examined Ms. Gutierrez. On re-direct examination approximately one half-hour after the recess, Ms. Gutierrez testified that she had seen Mother in the bathroom during the recess, and that there was suspicion that Mother was "shooting up" illegal drugs. ***Id***., at 76. Father then testified on his own behalf. ***See id***., at 80. Mother never returned to the courtroom. ***See id***., at 114.

At the close of the hearing, the trial court adjudicated the Children dependent pursuant to 42 Pa.C.S.A. § 6302, and ordered that legal and physical custody of the Children would remain with CYS, and the Children would remain in their placements in kinship care. ***See id***., at 112-114. G.B. was placed with his maternal grandparents, and the younger children with their paternal grandparents. ***See id***. On April 18, 2016, the trial court entered its adjudication in *seven* separate dispositional orders.

On May 17, 2016, Mother, through a court-appointed counsel, her previous counsel, Attorney Gina Carnes, timely filed a *single* notice of appeal[4] from the April 18 orders, along with a concise statement of errors

_____

[4] The filing of one notice of appeal from orders entered at different docket numbers "has long been discouraged." 20 G. Ronald Darlington, et al., Pennsylvania Appellate Practice § 341:3.102 (2013-2014 ed.) (footnote omitted). This policy is set forth in the *Note* to Rule 341, which states that "[w]here, however, one or more orders resolve issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed." Pa.R.A.P., 341 *Note*.

*(Footnote Continued Next Page)*

complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On June 3, 2016, Mother's counsel filed with this Court a motion for leave to file an amended concise statement. This Court granted the motion, and remanded the matter, retaining jurisdiction.

_(Footnote Continued)_ ───────────────

Courts, however, have not automatically quashed such appeals. For instance, our Supreme Court considered this question in **_General Electric Credit Corp. v. Aetna Casualty & Surety Co._**, 263 A.2d 448 (Pa. 1970), where the appellant filed a single appeal from two separate judgments entered against it. Upon considering these facts, our Supreme Court stated:

> Taking one appeal from several judgments is not acceptable practice and is discouraged. It has been held that a single appeal is incapable of bringing on for review more than one final order, judgment or decree. When circumstances have permitted, however, we have refrained from quashing the whole appeal, but this Court has quashed such appeals where no meaningful choice could be made.

**_Id_**., at 452-453 (internal citations and footnotes omitted).

Similarly, this Court, citing **_General Electric Credit Corp._**, declined to quash where counsel for appellants filed only one notice of appeal from separate orders denying each appellant's motion to intervene. **_See Egenrieder v. Ohio Casualty Group_**, 581 A.2d 937, 940 n.3 (Pa. Super. 1990). The panel noted that counsel should have filed a separate notice of appeal for each appellant and that the appeals would then have been subject to consolidation. **_See id_**. **_But see Commonwealth v. C.M.K._**, 932 A.2d 111 (Pa. Super. 2007) (court quashing single notice of appeal by criminal co-defendants who were tried jointly but sentenced individually).

Thus, the filing of one notice of appeal is "discouraged," but both our Supreme Court and this Court have refrained from quashing an appeal where "circumstances have permitted." Our examination of the procedural posture of this case leads us to the conclusion that the circumstances here permit us to exercise discretion and permit these appeals.

Our order directed Mother to file an amended concise statement within twenty-one days, and the trial court to file a supplemental opinion within forty days, from the date of our order. Mother filed an amended concise statement in the trial court, which we received in a supplemental record, as well as the trial court's supplemental opinion.

On appeal, Mother raises the following issues.

A. Whether the Court erred when it proceeded with the Adjudication and Disposition hearing even when Mother had no legal counsel present, when Mother indicated that she had counsel who could not be present, and when Mother indicated that she did desire to be represented by an attorney at the proceeding[?]

B. Whether the Court erred in continuing with the hearing without Mother being present; when following a court recess [M]other did not return and had previously complained about feeling ill[?]

C. Whether there was sufficient evidence to support of finding of dependency[?]

Mother's Brief, at 7.[5]

We will review Mother's issues together, as they are interrelated. The Pennsylvania Supreme Court recently set forth our standard of review in a dependency case as follows.

"The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility

---

[5] While Mother stated her issues somewhat differently in her concise statement, we, nevertheless, find them preserved for review. *Cf*. *Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006).

- 7 -

determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." ***In re R.J.T.***, 608 Pa. 9, [27], 9 A.3d 1179, 1190 (Pa. 2010). We review for abuse of discretion[.]

***In re L.Z.***, 111 A.3d 1164, 1174 (Pa. 2015).

Section 6302 of the Juvenile Act defines a "dependent child" as:

[a] child who:

(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]

This Court clarified the definition of "dependent child," as

whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available.

***In re G., T.***, 845 A.2d 870, 872 (Pa. Super. 2004) (internal quotations and citations omitted). ***See also In re J.C.***, 5 A.3d 284, 289 (Pa. Super. 2010).

"The burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency." ***In re G., T.***, 845 A.2d at 872 (citation omitted).

This Court has explained that

a court is empowered by 42 Pa.C.S. § 6341(a) and (c) to make a finding that a child is dependent if the child meets the statutory definition by clear and convincing evidence. If the court

finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

**In re D.A.**, 801 A.2d 614, 617 (Pa. Super. 2002) (*en banc*).

Regarding the disposition of a dependent child, subsections (e), (f), (f.1), and (g) of § 6351 of the Juvenile Act provide the trial court with the criteria for its permanency plan for the subject child. Subsection (f.2) of the same statute provides that evidence of the conduct of the parent that places the child at risk shall be presented to the court at any permanency hearing. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

Mother relies on § 6337 of the Juvenile Act as setting forth her right to counsel at all stages of a Juvenile Act proceeding. She asserts that she indicated to the court that she had retained private counsel who was not available on the day of the hearing, and that she did not understand what was happening at the proceeding. She argues that the trial court should have continued the matter because of the unavailability of her counsel. Mother also contends that, when she did not return to court after the mid-morning break, the trial court should have continued the matter. She claims that the trial court's action of moving forward with the hearing allowed its

- 9 -

finding of dependency to rest on insufficient evidence. Mother argues that it was fundamentally unfair to force her to represent herself, and, in so doing, the trial court denied her constitutional guarantee to due process of law. Mother further complains that the caseworker's testimony that Mother was in the restroom for a very long time, and that she suspected that Mother was "shooting up" illegal drugs could also indicate illness on the part of Mother. Mother states that there is nothing in the record concerning her illness, but that she had indicated, before she left the room, that she felt ill.

"Due process requires nothing more than adequate notice, an opportunity to be heard, and the chance to defend oneself in an impartial tribunal having jurisdiction over the matter." *In re J.N.F.*, 887 A.2d 775, 781 (Pa. Super. 2005) (citation omitted). "Due process is flexible and calls for such procedural protections as the situation demands." *In re Adoption of Dale A., II*, 683 A.2d 297, 300 (Pa. Super. 1996) (quoting *Sullivan v. Shaw*, 650 A.2d 882, 884 (Pa. Super. 1994)).

Section 6337 of the Juvenile Act provides that a party in a juvenile matter is entitled to representation by legal counsel at all stages of any proceeding. Section 6338 of the Juvenile Act provides that a party is entitled to the opportunity to introduce evidence and otherwise be heard on his own behalf and to cross-examine witnesses. Further, regarding permanency hearings under the Juvenile Act, Rule 1608(C)(1) of the Pennsylvania Rules of Juvenile Court Procedure provides that any evidence helpful in

determining the appropriate course of action, including evidence that was not admissible at the adjudicatory hearing, shall be presented to the court.

At the commencement of the hearing, the following exchange occurred among counsel for CYS, Attorney David Natan, Father's counsel, Attorney Patrick Diebler, the guardian *ad litem*, Cynthia Garman, and the trial court:

Mr. NATAN:

* * *

The mother of the children [R.B.] is present. She was represented by Attorney Gina Carnes. Attorney Carnes withdrew her representation at the last proceeding. As [Mother] has not requalified for appointed counsel, that matter was continued. [Mother] is present. I understand from my caseworker that [Mother] has retained private counsel, although whom that is, I do not know[,] and that she has indicated that her counsel is not available this morning to be present.

The father of the children is [B.B.]. He is present and represented by Attorney Patrick Diebler. The Guardian ad litem for the children[,] Cynthia Garman[,] is also present.

There have been three court[-]appointed special advocates appointed on behalf of the children. Mary Beth Filling was appointed to represent the interest of [M.B.]. Sandy Radom was appointed to represent the interest of [G.J.], actually [G.B.]. And Teresa Barker was appointed to represent the interests of [L.B.], [L.B.], and [A.B.]. And then Ms. Filling also has been appointed for purposes of representing [S.C.C.B.] and [F.B.]. That covers all the children.

I did receive an e-mail indicating that because of their recent appointment, although they have started the process of becoming involved in the case, they have not been able to yet have enough information to offer reports to the Court regarding their opinions. They are all present this morning.

I will indicate for the Court that the Agency is ready to proceed today. I believe [F]ather is ready to proceed today and I did not speak with [Mother] prior to the proceedings, so I'm not necessarily clear on a number of things. Certainly, I don't know whom this counsel is and I have not been contacted by anybody indicating they are representing her requesting a continuance.

THE COURT: [Mother], where is your lawyer?

[MOTHER]: My lawyer is in Delaware County in a hearing of Raheem versus Clayborn[,] and the Judge presiding over that is Dominic Pileggi[,] and I have the courthouse number if you would like to verify this. She was unable to reschedule it.

THE COURT: When did you retain this lawyer?

[MOTHER]: She verified the retention last night.

THE COURT: Last night –

[MOTHER]: She has been unable to get back to me because of her tight schedule in court this week and last week.

THE COURT: So you told your attorney last night that you had this hearing this morning, correct?

[MOTHER]: Yes, I did.

THE COURT: When did you get notice of this hearing?

[MOTHER]: The last time I was in court and I've been searching.

THE COURT: When did we give her notice of the hearing, Mr. Natan, do you know when that was?

MR. NATAN: Notice of the hearing was provided to [MOTHER] on – orally on March 3, 2016. She's had visitations at other times and I believe she was hand-delivered a copy of the notice also.

MS. GARMAN: It was announced in court on March 3rd as well and part of the continuance order.

THE COURT: I remember telling her the last time she was in court that we were going to have this hearing today. Is that your recollection, Ms. Garman?

MS. GARMAN: It certainly is.

MR. NATAN: Your Honor, we've assigned or we have taken an entire day out of the court schedule with only emergency petitions that needed to be addressed in order to try and get this matter resolved.

THE COURT: And the name of your attorney, [Mother]?

[MOTHER]: Debra Roffman.

THE COURT: Debra Roffman.

[MOTHER] Roffman, R-o-f-f, sir.

THE COURT: R-o-f-f-m-a-n?

[MOTHER]: Yes, sir.

THE COURT: Mr. Ruth, will you go back to my chambers and see if Ms. Roffman has advised me that she has been retained by [Mother], because if I do not have anything saying that she's been retained and she's requesting a continuance, we're going to proceed with this hearing.

[MOTHER]: Sir, she advised me to verbally beg Your Honor's understanding.

THE COURT: Do you have anything in writing from her confirming this?

[MOTHER]: No, she has not been able to do that.

THE COURT: Why did it take you a month and a half to get a lawyer?

[MOTHER]: Your Honor, to find a lawyer for this kind of a hearing in Lancaster County, I had to reach outside of Lancaster County because the information I was getting from lawyers locally was not completely accurate. I have been unable to get

full information for disclosure from the Agency because of my lack of an attorney.

THE COURT: You understand the importance of this hearing?

[MOTHER]: I have –

THE COURT: Do you understand the importance of this hearing?

[MOTHER]: I –

THE COURT: That's a yes or a no.

[MOTHER]: Yes, sir.

THE COURT: You understand that this is an adjudication dependency hearing with regard to your seven children and this was scheduled over a month and a half ago. Has she contacted my office?

THE BAILIFF: There's been no contact.

THE COURT: We are going to proceed with the hearing.

[MOTHER] I have been through many consultations, Your Honor, with several different lawyers looking for a lawyer who is going to be completely prepared and knew what they were doing and was going to give me the benefit of working towards my children's best interest. Everybody in this county has children, grandchildren. Most lawyers would not even consider it. I've been though many consultations. I have paid the Pennsylvania Bar for references and paid for consultations after that. I have gone through many interviews to find a good lawyer that can explain the situation to Your Honor fully.

THE COURT: I'm sure she can explain it to you after we have this hearing because we are going ahead with the hearing today. You have had enough time to have an attorney. This is not a game.

[MOTHER]: She was unable to get back to me –

THE COURT: This is not a game, [Mother]. We are going ahead with the hearing. Call your first witness, Mr. Natan. I find you had over –

[MOTHER]: Sir –

THE COURT: I'm talking now so you sit down. You had over a month and a half to get an attorney.

[MOTHER]: I have –-

THE COURT: We have scheduled this for a whole day, at least a whole morning of testimony, and I'm sure we're going to go into the afternoon probably.

[MOTHER]: I have information –

THE COURT: We have a whole gallery of people here who are here for this hearing. I'm somewhat familiar with you having at least two matters that have come before me at least with business court and another hearing where you did not even show up.

[MOTHER]: Because –

THE COURT: We are going to go ahead with the hearing. Call your first witness.

[MOTHER] Every conference, sir, no one listens.

THE COURT: When I talk, you stop talking. Do you understand that?

[MOTHER]: Please.

THE COURT: When we go ahead with this hearing, if you have any questions or don't understand what is happening, then you stop me. But at this point, we are going ahead with the hearing. It's an adjudication hearing. The standard is whether there is clear and convincing evidence the child's dependent. If you have any questions during the matter[,] during the course of the hearing, you can stop me. I'll be happy to advise you.

N.T., 4/14/16, at 4-10.

- 15 -

We find that the trial court appropriately adhered to the dictates of sections 6337 and 6338 of the Juvenile Act and Rule 1608(1) of the Pa.R.J.C.P. when the trial court proceeded with the hearing in the absence of counsel for Mother. The trial court provided Mother with plenty of time to find an attorney. And Mother had an opportunity to be heard. We find that the trial court did not violate Mother's constitutional guarantee to due process when it proceeded with the hearing.

Next, we address Mother's claim that the trial court deprived her of due process when it proceeded with the hearing after she had departed the courtroom, without returning. The record reflects that, as the direct examination of Ms. Gutierrez was nearing completion, the following exchange took place:

> MR. DIEBLER: Your Honor, if I could interrupt, my paralegal is requesting to leave the courtroom. He's feeling ill and needs to use the bathroom. Is that okay?
>
> THE COURT: Sure.
>
> [MOTHER]: Your Honor –
>
> THE COURT: We should be wrapping up this direct testimony within about a minute, shouldn't we?
>
> MR. NATAN: I'd say three, but yes. I believe [Mother] was also –
>
> THE COURT: Yes, [Mother]?
>
> [MOTHER]: I'm having a similar problem.
>
> THE COURT: Well, we'll be done in about three minutes here. I think you can hang on, can't you?

[MOTHER]: (Nods head up and down.)

THE COURT: Well, we'll be done in about three minutes here. I think you can hang on, can't you?

[MOTHER]: (Nods head up and down.)

THE COURT: She's acknowledged by the nod of her head that she can make it through at least a couple more minutes of direct examination.

BY MR. NATAN:

Q. You talked briefly about concerns of continued reports that have been received by the Agency since the childrens' [sic] placements into care?

A. Yes.

Q. There was a report I believe you said methamphetamine alleged against both mother and her boyfriend?

A. Yes.

Q. Has that report been able to be investigated at this time?

We've briefly. I mean we've been trying to ascertain through the drug screens. Since we don't know where they live. We can't ascertain that from where they are residing, and so far her drug screens have been negative.

Q. And you've not had any contact with [Mother's paramour, J.N.,] because he is not a biological parent to any of these children?

A. Correct.

Q. I understood he was coming to some of the visits at the periods of time, was not being allowed into the visitation area, was staying outside of the agency on public property?

A. Correct.

Q. Have there been any incidents in which he needed to be removed from the agency property by the sheriff's department?

A. Yes, at the beginning there was an incident where he was knocking on the window while [Mother] was visiting with the kids, with the children, and the sheriff had to, you know, ask him to stop and if not then he would be removed.

Q. In the event [Mother] desires to remain in a relationship with [J.N.] and/or reside with [J.N.], the Agency would need to do a full assessment of him?

A. Yes.

Q. At this point, the Agency is aware of some at least ancillary or preliminary concerns as it relates to him in a caregiving role for the children?

A. Yes.

Q. It's the Agency's understanding that [J.N.] is the father[,] I believe you indicated[,] of five other children and that there are court proceedings ongoing in Cumberland County regarding those children?

A. Yes.

Q. For which [J.N.] failed to appear at a hearing on April 7 and was held in contempt?

A. Yes.

Q. And there is another proceeding now currently scheduled for April 22nd of this year at which he needs to appear for sentencing for his failure to comply with the prior court order?

A. That's correct.

Q. In addition, I understand a report has been received by the Agency within the last week regarding some concerns for [J.N.'s] care of his own children?

A. Yes.

Q. And is that currently being screened in [sic] for investigation by the Agency?

A. Yes.

Q. Is it your understanding that the nature of the report involves a physical altercation or potential physical altercation between one of the children, [J.N.], and [Mother]?

A. Correct.

Q. But at this point[,] as I understand it, the report just came in and has not yet been able to be assessed?

A. Correct.

Q. What information, at least as the report indicates, does the Agency now have regarding where [Mother] is residing in the home?

A. It is my understanding the report states that they were residing at [J.N.'s] I guess mother's house[,] which would be the paternal grandparents' house for [J.N.'s] children.

Q. And there were concerns for ongoing drug use by some of the household members as part of that report?

A. Yes.

Q. Some concerns for domestic violence also?

A. Yes.

Q. But the report has come in as a general protective services again not as abusive report at this time?

A. Correct.

MR. NATAN: Thank you.

THE COURT: All right. We'll take a recess for at least five minutes and then we'll start again.

(A recess was taken.)

THE COURT: **We took a break approximately 15 minutes ago to start within another approximately 5 minutes. We've now waited approximately 10 minutes for [Mother] to rejoin us and she's given no excuse as to why she is not here at this point[,] at least to me, and she has even taken everything off of her table and did not leave anything in here when we took the break approximately 15 minutes ago**. Mr. Diebler, do you have any questions?

MR. DIEBLER: Your Honor, I have no questions.

THE COURT: Ms. Garman, do you have any questions for the case worker?

MR. DIEBLER: Your Honor, I apologize, was that do I have any questions for the caseworker?

THE COURT: Yes.

MR. DIEBLER: Yes, I do have questions for the caseworker. I apologize.

*Id*., at 59-63 (emphasis added).

Subsequently, Attorney Diebler and Attorney Garman conducted cross-examination of Ms. Gutierrez, respectively. On re-direct examination of Ms. Gutierrez by Attorney Natan, the following exchange took place:

BY MR. NATAN:

Q. During the recess that just occurred, were there any concerns for [Mother's] behavior?

A. Yes, she went into the bathroom. She was in there for a long period of time. There were – I'm not sure what she was doing in the bathroom. I mean there was the suspicion that she

- 20 -

might have been shooting up [an illegal drug], but I'm not positive[,] and then she left.

Q. So she's not returned to the court. It's now 11:15 and about 25, 30 minutes since we last broke and you haven't seen her?

A. No.

Q. You were in the bathroom at the same time she was?

A. Yes.

Q. In addition to all of the testimony you previously gave with regards to [Mother], it's my understanding that -- you then testified that her  -- the gentleman with who she's believed to be in a relationship and living with, he has recent marijuana charges; is that correct?

A. Correct.

Q. And those charges were lodged on March 31st of this year?

A. I believe so.

Q. In addition, the most recent report was made which I had asked about prior to the break against [J.N.] indicated marijuana use in that home as well as crystal methamphetamine in that home?

A. That's my understanding, yes.

Q. It's believed that [Mother] is also residing in that home with [J.N.] at this time?

A. Correct.

Q. Even though the Agency is at this point [sic] has not had a positive drug screen during one of the scheduled visits, there's not been the ability to do any random drug screen since [Mother] has consistently refused to give an address where she is residing?

A. Correct.

Q. Does the Agency believe that it would be appropriate to add a drug and alcohol goal for [Mother] based on the behaviors not just that occurred in the courthouse today but over the last week and a half?

A. Yes.

MR. NATAN: Thank you.

THE COURT: You may step down. Thank you. Do you have any further questions?

MR. DIEBLER: No, Your Honor.

THE COURT: Your next witness, Mr. Natan?

MR. NATAN: She left, Your Honor. I was going to call the mother on cross. So I will at this point, unless she returns, rest.

THE COURT: Well, this is the fifth time that I've had something scheduled with [Mother] in the last three months. The first time was a business court matter filed by the father and she failed to appear. The second time was a petition for custody contempt filed by the father in which we had a hearing and she failed to appear. The third time was a risk of harm hearing follow-up for the father and she failed to appear.

The last time that she was with the Court it was for a continuance[,]  on March 3, 2016[,] of the adjudication and disposition hearing, partly at the request of her[,] so that she could get an attorney.

**She has now failed to come back from her break.  My bailiff staff has looked for her, does not know where she is now**. So I take it the Agency is resting their case now and moving for the admission of the exhibits into evidence?

MR. NATAN: We are, Your Honor. I would ask the Court to require or to approve that the Agency, A, correct [G.B.'s] plan[,] with regards to his last name[,] and add [Father's] last name, make the corrections to domestic violence goals on all of the plans as they relate to [Mother], as well as for the addition of

the drug and alcohol goal for [Mother]. And if those are approved, I will submit revised plans to the Court for final approval.

      THE COURT: Any objection, Mr. Diebler?

      MR. DIEBLER: No objection, Your Honor.

      THE COURT: Ms. Garman, do you have any objection to that?

      MS. GARMAN: Certainly not.

      THE COURT: I take it you are in agreement with the changes to the plan?

      MS. GARMAN: Yes.

*Id*., at 76-79 (emphasis in original omitted; emphasis added).

At the close of the hearing, the trial court stated as follows:

THE COURT: The [c]ourt did meet and listen to the paternal grandmother at a prior contempt hearing. I find there's been clear and convincing evidence that's been presented to the Court by the Agency that all children, all seven of them[,] are dependent. It's obvious to me that the children were without proper care and control while they were with[,] at least with[,] the mother for a number of reasons belonging to education, emotional health, medical health, income, housing and now suspected or maybe continuing to be suspected are drug use with meth and/or marijuana.

      The findings of fact are included with what I've just said as well as in the dependency petition Paragraphs A through K which have been proved by clear and convincing evidence of the children to all be removed from the custody[,] from the mother.

      At this point, the Agency's obviously made more than reasonable efforts to comply with family finding requirements, and[,] unfortunately, the oldest child[, G.B.,] is with the – will stay with the maternal grandparents and the younger six children will stay with the paternal grandparents at this point. Legal and physical custody will remain with the Children & Youth

- 23 -

Agency. The educational surrogate will continue to be Ms. Garman.

The Agency's authorized to consent for routine medical treatment, as well as I will await the Agency presenting me with an order to have the three younger children immunized. I certainly believe that's warranted in this situation.

Visitation for the mother will continue for one hour per week, provided she takes the drug screen and passes it before the visitation commences. Visitation with the father can, [sic] in which it is currently one hour a week, can be increased in consultation with the Agency as to what can be improved upon and appropriate. I don't have a problem with the children having more time than a one[-]hour group session with all six of them together. I believe it's appropriate to have more time with the children broken up in terms of their situation with the father.

The children will remain with the grandparents as a [sic] I've previously indicated where they are now. That's the least restrictive placement which meets the needs of the children. That's the least restrictive alternative available. The children are safe in the current setting. Obviously, reasonable efforts were made to place the siblings together. Only one out of seven who is not with the rest of them at this point, but at least they have visitation with each other.

The next hearing in this matter, the review hearing[,] is scheduled for June 1, 2016 in the morning, so we'll make that 8:30 in the morning so everyone can appear.

**I'll note it's now afternoon time and [Mother] has not returned to the courtroom**. I think that more than shows evidence to the [c]ourt of her unwillingness to comply with the [c]ourt in a normal decorum of someone who comes to [c]ourt as well as taking any type of interest with the welfare of her children. Anything more, Mr. Natan?

MR. NATAN: No, Your Honor.

MS. GARMAN: If I may, Your Honor, would the order include that the mother's visits continue to be supervised and that the father's visits need not be, because if the order does not say that the visits have to be supervised, the Agency has the

- 24 -

problem with [M]other insisting they don't have to be[,] and if you don't stipulate that the father's visits don't have to be supervised, then she's going to kick up a fuss about why aren't his visits supervised. So I think Your Honor can avoid a problem by drafting your orders accordingly.

THE COURT: Well, the mother's visits should be supervised with the Agency, there's no doubt about that. I don't have an objection to the father having unsupervised visitation as long as it's worked out and is appropriate with the Agency. The plans that were presented in totality[,] Exhibit 1 which were admitted during the hearing[,] are appropriate and feasible.

The plans are approved with the addition of the drug and alcohol goal for [M]other, that the domestic violence goal for the mother was changed from being a perpetrator to a victim, that the plan will correct [G.B.'s] last name to reflect that it's [B.], and that the references may be in the petition to the correct name of the father are all amended at the appropriate – that have to be amended to [B.B.]. I believe that covers everything. Thank you.

*Id*., at 112-115 (emphasis added).

We find that the trial court appropriately adhered to the dictates of sections 6337 and 6338 of the Juvenile Act and Rule 1608(1) of the Pa.R.J.C.P. when the trial court proceeded with the hearing and continued to hear testimony and admit documentary evidence in the absence of Mother. Mother *disappeared* during the morning recess and did not return. When she left she offered little explanation other than indicating that she was having "similar issues" to the illness expressed by the paralegal for Father's counsel. The trial court did not violate Mother's constitutional guarantee to due process when it proceeded with the hearing, as Mother had an

opportunity to be heard. It appears from a review of the record that Mother voluntarily absented herself from the proceeding.

Finally, we find that Mother waived her third issue, challenging the sufficiency of the evidence to support an adjudication of dependency, for her failure to support and discuss her challenge to the sufficiency of the evidence with any citation to appropriate statutes and cases.[6] *See*, *e.g.*, *Chapman-Rolle v. Rolle*, 893 A.2d 770, 774 (Pa. Super. 2006).

Orders affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/20/2017

---

[6] We could also construe Mother's failure to support and discuss her first two issues as a waiver of those issues on appeal. We decline to find waiver as to her first two issues, which we have addressed in order to explain that the trial court did not deprive Mother of due process.